UNITED STATES of America,
Plaintiff,

Janet Powell Dixon, etc., and Harlem Civic Improvement Association, Intervening Plaintiffs-Appellants,

v.

HENDRY COUNTY SCHOOL DISTRICT et al., Defendants-Appellees.

No. 74–2400.

United States Court of Appeals,
Fifth Circuit.

Nov. 11, 1974.

W. George Allen, Fort Lauderdale, Fla., William S. Finger, William H. Abbuehl, Florida Rural Legal Services, Inc., Belle Glade, Fla., for plaintiffs-appellants.

James F. Garner, G. Gordon Harrison, Fort Myers, Fla., for defendants-appellees.

Robert W. Rust, U. S. Atty., Clemens Hagglund, Asst. U. S. Atty., Miami, Fla., William B. Saxbe, Atty. Gen., Samuel J. Flanagan, Brian K. Lansberg, Attys., U. S. Dept. of Justice, Washington, D. C., for the United States.

Before GEWIN, GOLDBERG and DYER, Circuit Judges.

GOLDBERG, Circuit Judge:

Among the Everglades on the south shore of Lake Okeechobee lies Hendry County, Florida, a largely rural polity whose 13,000 residents include whites, blacks, Hispanic-Americans and Seminole Indians. On July 9, 1970, the United States filed suit in federal district court to desegregate the Hendry County public schools. On August 4, 1971, Chief Judge Fulton issued an order creating a unitary school system by combining all classes of each grade into one school in each area of the county. Janet Powell Dixon and the Harlem Civic Improvement Association (plaintiffs) moved to intervene in the lawsuit on September 3, 1971, and petitioned the district court to reconsider its order as it applied to the Clewiston area of Hendry County. The court granted the petition to intervene but declined to reconsider the order, and Hendry County schoolchildren attended integrated schools for the first time in the Fall of 1971. The present controversy began on October 26, 1973, with a motion by the County School Board for permission to construct a new elementary school to serve the Clewiston area of the county. Although the United States did not object to the plan, the intervening plaintiffs felt that such construction was inimical to the maintenance of the unitary system of public education in Hendry County and asked the district court to

deny the Board's motion. After a hearing on the matter, Chief Judge Fulton determined on March 5, 1974, pursuant to this Court's directive in Calhoun v. Cook, 5 Cir. 1970, 430 F.2d 1174, that the construction of the new school could go forward. The intervening plaintiffs appealed. We affirm.

I

Before August 4, 1971, all white students in the Clewiston area attended Clewiston Elementary School, Clewiston Middle School or Clewiston High School; all black students attended Harlem Academy. Residential patterns in Clewiston also followed a bifurcated pattern: whites lived in the northern portion of the community and blacks lived in the southern sector. When the School Board finally realized that it would have to obey the law and integrate its system, its first thought was to close Harlem Academy and bus all black students to one of the three formerly-white schools. The able trial judge's order of August 4, however, required the Board to continue to utilize Harlem Academy.

Since 1971, all Clewiston students, black and white, in grades 1–5 have attended Clewiston Elementary School; students in grades 6–12 have attended Clewiston Middle School and Clewiston High School; and all preschool, kindergarten and special education students, and students in certain vocational and physical education classes, have utilized Harlem Academy. The Clewiston schools unquestionably comprise a unitary system—every student in each grade attends the one school to which his or her grade is assigned.

In early 1973, the Florida Department of Education conducted a survey of all schools in the Hendry County system and subsequently published a report showing that one of the five permanent buildings comprising Clewiston Elementary School failed to meet State fire safety regulations, that another was considered inadequate for instructional purposes and that the cafeteria, toilet and media center facilities were totally in-

adequate for the existing enrollment. The school was also found to be significantly overcrowded; although the desirable pupil capacity is 960 students, the current enrollment is nearly 1060 students and almost 1100 students are expected by the 1975–1976 term. The combination of these factors led the State survey staff to recommend the construction of a new elementary school in Clewiston.

In accordance with this recommendation, the School Board proposes to build a new school in three phases: phase one is designed to house all students in grades 3–5 by the 1975–1976 term; phases two and three will house all students in grades 1 and 2 and accommodate the school's administrative offices, a cafeteria and a multi-purpose area, but no date has been set for the completion of these phases. Until phase two is completed, grades 1 and 2 will remain in the serviceable buildings of the Clewiston Elementary School. The School Board plans to build the new elementary school on a site adjacent to the Clewiston Middle School, in a predominantly white but sparsely settled area equidistant from the respective centers of the white and black communities, 1.10 miles from Clewiston Elementary School and 1.45 miles from Harlem Academy. Not only is this site satisfactory to the State Department of Education, but the land which the school is to occupy will be donated to the School Board by the United States Sugar Corporation.

Plaintiffs oppose the School Board's plan. They contend that no new construction is necessary because Harlem Academy could be renovated at moderate cost and used to relieve the overcrowded conditions at Clewiston Elementary School. Of greater constitutional import is plaintiffs' argument that the School Board's decision to build a new school rather than renovate Harlem Academy is predicated upon racial considerations—that the Board refuses to bus white children into the heart of the black community. Plaintiffs also charge that the Board's plans will compel black children to travel to the white community for school while white pupils will be permitted to remain in their own neighborhood, so that the burden of desegregation will be thrown primarily upon the black population of Clewiston.

The trial judge, fully cognizant of the importance of new school construction as a tool for the implementation or frustration of desegregation orders, weighed the following factors in determining whether the proposed school was necessary and the location unobjectionable:

1. population growth;
2. finances;
3. land values;
4. site availability;
5. racial composition of the student body;
6. racial composition of the neighborhood of the proposed school and the residence of the students;
7. capacity and utilization of existing facilities;
8. transportation requirements;
9. the location of a proposed school to maintain equality in the burden of bussing between blacks and whites;
10. recommendations by the State Department of Education;
11. potential for future re-segregation.

A consideration of these factors convinced the district court that "the proposed construction . . . is constitutionally permissible and educationally sound, and the established unitary school system in Hendry County and Clewiston will not be disturbed." In order to obviate any possible inequities resulting from the new construction, the court ordered the Board to continue to provide free transportation to students living within a two-mile radius of the new school as well as to those residing at a greater distance.

## II

To the casual observer, the location and construction of a new school would

not seem to present problems of interest to the federal judicial system. In the context of school systems which have only recently been desegregated, however, such questions assume a fundamental importance in the effectuation of equal educational opportunity for all Americans. In Swann v. Charlotte-Mecklenburg Bd. of Educ., 1971, 402 U. S. 1, 20–21, 91 S.Ct. 1267, 1278–1279, 28 L.Ed.2d 554, 569–570, the United States Supreme Court stressed that:

> The construction of new schools and the closing of old ones are two of the most important functions of local school authorities and also two of the most complex. They must decide questions of location and capacity in light of population growth, finances, land values, site availability, through an almost endless list of factors to be considered. The result of this will be a decision which, when combined with one technique or another of student assignment, will determine the racial composition of the student body in each school in the system. Over the long run, the consequences will be far reaching . . . The location of the schools may . . . influence the patterns of residential development . . . [I]t is the responsibility of local authorities and district courts to see to it that future school construction and abandonment are not used and do not serve to perpetuate or re-establish the dual system.

A similar concern with the development of newly-desegregated school districts prompted this Court to suggest in Calhoun v. Cook, *supra*, that federal district courts involved in school matters should retain jurisdiction of those cases in order to ensure the continuing legality of the various educational operations.

The plaintiffs here are highly suspicious of the intentions of the Hendry County School Board, and these suspicions are certainly understandable. The history of segregated public education in the county is not "ancient history," as the School Board blithely suggests, but is a recent and bitter memory that will forever haunt the lives of the thousands of Hendry County adults who have been denied equal educational opportunities because their skins are black.

We must review the decision of the district court not on the basis of recent memory nor on one of nascent hope, however, but under the standard of abuse of discretion. Stout v. Jefferson County Bd. of Educ., 5 Cir. 1974, 489 F. 2d 97; Jones v. Caddo Parish School Bd., 5 Cir. 1973, 487 F.2d 1275. With this standard in mind, we will examine each of plaintiffs' contentions in turn.

Plaintiffs argue that the School Board could renovate Harlem Academy and thereby alleviate overcrowding at Clewiston Elementary School, but that the Board refuses to implement such an alternative because it refuses to require white children to attend a formerly-black school in a black community. Furthermore, plaintiffs contend that, in order to pursue those same ends while faced with the district court's refusal to approve the closing of Harlem Academy, the Board has assembled at that location all of those programs which symbolize "what blacks do best:" vocational training, special education and pre-school acculturation classes. These are serious charges. The equal protection clause of the Fourteenth Amendment forbids any invidious discrimination on the basis of race. Yick Wo v. Hopkins, 1886, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220. The closing of schools formerly used for the instruction of minority students may constitute such an instance of discrimination, Arvizu v. Waco Independent School Dist., 5 Cir. 1974, 495 F.2d 499, rehearing denied, 496 F.2d 1309; Lee v. Macon County Bd. of Educ., 5 Cir. 1971, 448 F. 2d 746, and the slanting of instruction at such schools on the basis of stereotyped racial theories is similarly prohibited.

Happily, however, the record here does not demonstrate such discrimination. All of the classes at Harlem Academy are fully integrated and all

Clewiston children who attend such classes attend Harlem Academy. Chief Judge Fulton could find nothing to substantiate the charge that the classes chosen for Harlem were chosen in an impermissible manner or with an impermissible motive. The district court also determined, after a thorough study of the record, that the School Board was completely justified in chosing to build a new school rather than renovating Harlem Academy. The trial court concluded that the cost of renovation would be considerably greater than plaintiffs had projected and that the School Board could reasonably have decided that even if Harlem Academy were to be restored, the age and structural configuration of the school would render such a facility much less attractive and adaptable for instructional purposes than a new plant. Finally, if Harlem Academy were to be restored, the activities presently located there would have to be moved elsewhere, presumably to some new structure of their own. In these circumstances, the district court declined to question the School Board's choice of alternatives.

We believe that the factual findings of the trial court are fully supported by the record and that its order was clearly within the bounds of reasonable discretion. We must never conclude that federal district judges are actually school superintendents who enter office by a slightly different route and discharge certain additional responsibilities. As the Supreme Court cautioned in *Swann, supra,* "it is important to remember that judicial powers may be exercised only on the basis of a constitutional violation. Remedial judicial authority does not put judges automatically in the shoes of school authorities whose powers are plenary. Judicial authority enters only when local authority defaults." 402 U.S. at 16, 91 S.Ct. at 1276, 28 L.Ed.2d at 566.

 The other question in this case is whether the proposed location of the new school is a proper one under all the circumstances. We cannot tolerate

resegregation of a former dual school system, and the School Board of such a system must demonstrate that the new construction will not tend to promote such a relapse. Keyes v. School Dist. No. 1, 1973, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548; United States v. Board of Public Instruction, 5 Cir. 1968, 395 F.2d 66. We must also ensure that the burdens of desegregation are distributed equally among all classes of citizens. Arvizu v. Waco Independent School Dist., *supra;* Cisneros v. Corpus Christi Independent School Dist., 5 Cir. 1972, 467 F.2d 142 (en banc); Lee v. Macon County Bd. of Educ., *supra; cf.* Quarles v. Oxford Municipal Separate School Dist., 5 Cir. 1973, 487 F.2d 824.

Plaintiffs contend that the new school site is intolerable because it lies in the white community, so that "one-way bussing" of black children into "white" schools would be the result of the Board's plans. Although we sympathize with plaintiffs' fears—this year is, after all, only the fourth year of integrated public education in Hendry County—those fears are not substantiated by the facts of this case.

The district court found that the proposed site is very nearly equidistant from the centers of both the white and black residential communities in Clewiston and that although the immediate neighborhood of the site is populated mostly by whites, the neighborhood is so sparsely settled that the area is not so much "white" or "black" as it is empty. The black students of Clewiston will be considerably closer to the new school than they are to Clewiston Elementary School; what is more important, "closer" in this case is also "close"—many black children will be able to walk to school if they so choose. Considerable numbers of pupils of each race will be bussed to the new school and the overall transportation burden will be distributed with equal effect upon each race. *See* Quarles v. Oxford Municipal Separate School Dist., *supra.* We detect no error in these findings of the district court.

·Chief Judge Fulton reviewed all of the evidence and all of the factors bearing upon the maintenance of a unitary school system in the Clewiston area, *see* Swann v. Charlotte-Mecklenburg Bd. of Educ., *supra,* 402 U.S. at 20–21, 91 S.Ct. at 1278–1279, 28 L.Ed.2d at 569; Green v. County School Bd., 1968, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716; United States v. Board of Public Instruction, *supra,* and concluded that the effect of the new construction upon the Clewiston schools would not be regressive. For the present, we are convinced that the curative prescriptions for the desegregation of the Hendry County public school system have had a salutary effect. The plaintiffs' petition for an alternative remedial elixir was carefully considered by the trial court and was found to be unnecessary. We find no cause to meddle with the district court's diagnosis nor to prescribe a different medication. The order of the district court is

Affirmed.