Birdex COPELAND, Jr., et al.,
Plaintiffs-Appellants,

v.

LINCOLN PARISH SCHOOL BOARD et al., Defendants-Appellees.

and

UNITED STATES of America,
Plaintiff-Appellant,

v.

LINCOLN PARISH SCHOOL BOARD et al., Defendants-Appellees.

Nos. 78–1315, 77–3375.

United States Court of Appeals,
Fifth Circuit.

July 13, 1979.

---

Piper & Brown, Frank E. Brown, Jr., Shreveport, La., for plaintiff-appellant in No. 78–1315.

Mark L. Gross, Walter W. Barnett, U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellant in No. 77–3375.

Sidney E. Cook, Dewey W. Corley, Shreveport, La., for defendants-appellees.

Before BROWN, Chief Judge, GEE and VANCE, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Today we add a short chapter to the long book on the desegregation of Lincoln Parish public schools. The case before us presents two appeals, both brought within the context of a consent decree that currently governs the nondiscriminatory operation of Lincoln Parish schools. In the first, the plaintiffs[1] challenge the District Court's finding that racial considerations did not motivate the site selections for two new schools. The United States claims in the second action that the District Judge improperly refused to add defendant parties to the continuing suit under the consent decree. While we uphold, and therefore affirm, the Court's determination regarding new construction sites, we think that the District Judge, in the interests of judicial economy, should have allowed the United States to add parties. We, therefore, reverse and allow the Government to add additional defendants to further litigation under the consent decree.

The United States began the long process of school desegregation on June 8, 1966, when it filed the original complaint in *United States v. Lincoln Parish School Board*.[2] At that time, the School Board operated nine all-white schools and seven all-black schools.[3] Additionally, there were two college laboratory schools, which, technically, were operated by the Louisiana State Board

---

1. Birdex Copeland and Richard Gallot, individually and as guardians ad litem of school children, and the Grambling United League of Voters. They sought to represent all black parents who have children in public schools in Lincoln Parish. At trial, the Court certified the class, but dismissed the claims of the Voters League because it lacked standing and because it was an unnecessary party. *See* R. at 725.

2. Civil Action No. 12,071, on the docket of the United States District Court for the Western District of Louisiana.

3. The all-white schools were Choudrant High, Cypress Spring Elementary, Dubach High, Glen View, Hico, Hillcrest Elementary, Ruston Elementary, Ruston High, and Simsboro High. The all-black schools were Fellowship Elementary, Greenwood Elementary, Hopewell High, I. A. Lewis, Lincoln Elementary, Lincoln High, and St. Rest Elementary.

of Education.[4] One of these, operated by Louisiana Tech University, had an all-white student population; the other, operated by Grambling State University, had only black students.

As a result of the Government's suit, Lincoln Parish began assigning students to the various schools according to individual preference as stated on "freedom of choice" forms. When this method of desegregation proved ineffective, the United States moved for a new plan that utilized attendance zones and feeder patterns for all schools in Lincoln Parish except for the college laboratory schools.[5] This plan, which was adopted on August 1, 1969, and modified on August 5, 1970, remains in effect, the District Court having retained jurisdiction for all purposes.[6]

Between 1970 and 1976 the School Board made great strides toward its stated goal of racial integration in public schools. As of the 1976 school year, it operated eleven schools with the following racial compositions:

| School | Black | White | Other | Total | % Black | % White |
|---|---|---|---|---|---|---|
| Cypress Springs | 202 | 221 | 7 | 430 | 47 | 53 |
| Hillcrest | 189 | 278 | 3 | 470 | 40 | 60 |
| Ruston Elementary | 163 | 221 | – | 384 | 42 | 58 |
| Lincoln Learning Center | 52 | 41 | – | 93 | 56 | 44 |
| I. A. Lewis | 125 | 129 | 1 | 255 | 49 | 51 |
| Glen View | 289 | 347 | 1 | 637 | 45 | 55 |
| Ruston High | 438 | 672 | 4 | 1114 | 36 | 64 |
| Choudrant | 107 | 293 | – | 400 | 27 | 73 |
| Dubach | 123 | 155 | – | 278 | 44 | 56 |
| Hico | 139 | 141 | – | 280 | 50 | 50 |
| Simsboro | 139 | 212 | – | 351 | 42 | 58 |
| Totals | 1966 | 2710 | 16 | 4692 | 42 | 58 |

These ratios compare favorably to that of the overall student population of the parish—about 55% to 45% white to black. Additionally, since 1970 the racial composition of the school faculties has steadily improved, presently reflecting a 63% to 37% white to black ratio.

The Lincoln Parish School System is divided into four attendance zones, one of which is Ruston-Grambling, the area with which we are primarily concerned in this case. It is divided into two wards and has the largest pupil concentration in the parish—containing seven parish schools and both laboratory schools. All seven of the area's parish schools, as well as Louisiana Tech's A.E. Phillips, are located in Ward I near Ruston. Ruston, a biracial community with an approximately 60% white and 40% black population, is located about four miles east of Grambling in Ward II, which has a population over 99% black.

The School Board provides bus transportation to all the parish schools in the Ruston-Grambling zone and to both laboratory schools.[7] Blacks and whites bear the trans-

4. Although the schools were, and still are, run by the State Board of Education and by the university officials, the School Board acts as a conduit for funds and materials forwarded to the universities pursuant to the State Equalization Formula. It also provides transportation for pupils at the laboratory schools, subject to reimbursement by the State of Louisiana. Moreover, the School Board approves the faculty selections of the laboratory schools.

5. Presumably the laboratory schools were excluded from the terms of the consent decree so that their admissions policies would reflect those of their parent universities, which oper-

ate under "freedom of choice." See deposition of Morelle Ammons, R. at 395.

6. See R. 32 -33.

7. The School Board, however, does not provide transportation from Ward II to schools outside Ward II; only a few parents have requested such transportation. Those few may receive up to $100 per child or $200 per family per year for transportation under a reimbursement program maintained by the State Board of Education. District Court opinion at 5, Copeland v. Lincoln Parish, R. at 728. The Court also stated that "witnesses for the plaintiffs testified that they did not know of a single school child

portation burden in approximate relation to their population ratio, with whites traveling 57% of the busing miles, blacks traveling 43%.

During the spring of 1976 the Lincoln Parish School Board began to evaluate possible sites for two new parish schools.[8] The Superintendent Thomas Judd and various staff personnel personally inspected several potential locations to determine which would offer the greatest accessibility while maintaining racial balance. In July of 1976 the Ad Hoc Committee on Education and the Grambling United League of Voters petitioned the School Board to construct a junior high and a high school in Ward II, near Grambling.[9] In response, the school board, acting primarily through Superintendent Judd, further investigated possible Ward II locations.[10]

After completion of this site selection study, the Board approved two sites, both within Ward I and both located so that the black to white student ratio within a one and a half mile radius would closely approximate that of the school system population.[11] The chosen locations, which would significantly reduce the number of student miles of transportation, also enjoy satisfactory drainage and utility accessibility.

The plaintiffs then brought this suit requesting further relief under the August 5, 1970, desegregation consent decree. They relied on Part IV [12] of the decree in seeking to require the School Board to construct a school in Ward II.[13] On January 31, 1977, the District Court granted the United States leave to serve as *amicus curiae* and granted a motion to consolidate this action with the original desegregation suit. On July 22, 1977, the United States moved to add additional parties defendant in order to litigate modification of the consent decree to include the laboratory schools at Grambling State University and Louisiana Tech University. Before ruling on that motion, the District Court held a trial on the plaintiffs' complaint.[14]

On November 1, 1977, the Court denied the request for addition of parties defendant, and the United States filed one of the appeals before us today. On November 30, 1977, the District Judge entered his Opinion and Order denying plaintiffs' request for further relief. The plaintiffs then filed the second of the present appeals. We will consider these separately, addressing first the site selection issue.

We approach this question with a realization of the importance of the location of

---

who was unable to attend a school outside of Ward II as a result of the transportation policy." *Id.*

8. The Board planned a new elementary school and a new junior high. No other schools have been constructed since 1966.

9. This group never proposed specific sites for consideration.

10. According to the School Board's brief, it sought guidance from the United States Department of Justice. Superintendent Judd also offered to meet with a member of the Ad Hoc Committee and the presiding Judge to discuss the site selection issue. The Committee, however, refused the invitation.

11. As the District Court found, "[t]he choice of the two sites would result in two new fully integrated neighborhood schools." District Court opinion at 6, *Copeland v. Lincoln Parish School Board*, No. 76 1191, R. at 729. The new elementary school will be 60% white and 40% black, and the junior high will be 55% white and 45% black.

12. Part IV provides that

[a]ll school construction, school consolidation, and site selection (including the location of any temporary classrooms) in the system shall be done in a manner which will prevent the recurrence of the dual school structure once this desegregation plan is implemented.

13. More specifically, they sought declaratory relief and orders:

(1) Requiring defendants to further desegregate the public school system in Lincoln Parish, Louisiana;

(2) Restraining and enjoining any further expenditure of public funds on any new school construction sites or renovation of existing educational facilities;

(3) Requiring defendants to conduct a public hearing and give priority consideration to the establishment of a new school construction site within Ward II of Lincoln Parish, Louisiana.

*See* R. at 625.

14. This trial was held on September 20, 1977.

public schools in recently desegregated areas. In *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 1971, 402 U.S. 1, 20–21, 91 S.Ct. 1267, 1278–79, 28 L.Ed.2d 554, 569–70, the Supreme Court stressed that

> [t]he construction of new schools and the closing of old ones are two of the most important functions of local school authorities and also two of the most complex. They must decide questions of location and capacity in light of population growth, finances, land values, site availability, through an almost endless list of factors to be considered. The result of this will be a decision which, when combined with one technique or another of student assignment, will determine the racial composition of the student body in each school in the system. Over the long run, the consequences of the choices will be far reaching . . . The location of the schools may . . . influence the patterns of residential development . . . [I]t is the responsibility of local authorities and district courts to see to it that future school construction and abandonment are not used and do not serve to perpetuate or reestablish the dual system.

■ Of course, this Court, in reviewing the actions of the District Court can disturb its determination only if we find it clearly erroneous. *United States v. Hendry County School District*, 5 Cir., 1974, 504 F.2d 550, 553.

Plaintiffs-appellants assert that, under this standard of review, we must find constitutionally impermissible racial motivation in the school site selections. They argue that the placement of two new schools in Ward I, coupled with the School Board's failure to bus children out of Ward II, will promote resegregation of Lincoln Parish schools. The District Court's order, therefore, must be reversed. We disagree.

As our recounting of the facts has shown, the School Board seriously considered several criteria before making its final choice. Its committee studied each location with an eye to (1) centrality, (2) maintenance of racial balance, (3) racially balanced decrease in overall student transportation mileage, (4) ease of access and availability of transportation arteries, (5) accessibility of utilities, and (6) size and shape compatible with planned construction, further expansion, and community growth. These criteria are similar to, in fact more detailed than, those approved by this Court in *Davis v. Board of Commissioners of Mobile County*, 5 Cir., 1973, 483 F.2d 1017. *See also Lee v. Chambers County Bd. of Educ.*, 5 Cir., 1976, 533 F.2d 132.

■ Upon reviewing these criteria, the District Court concluded that "[t]he sites will promote integration, not resegregation." R. at 731. In light of (1) the cited black to white ratios at the proposed schools, (2) the substantial and racially balanced reduction of busing miles, and (3) the racial compositions of the immediately surrounding areas of the sites, we must uphold this determination. Indeed, we find that the School Board fulfilled its judicially imposed obligation to "examine its construction plans with a view to furthering desegregation . . . ." *Lee v. Autauga County Bd. of Educ.*, 5 Cir., 1975, 514 F.2d 646, 648.[15]

■■ Regardless of the outcome of further litigation concerning desegregation of the laboratory schools,[16] we find that—at the time the School Board selected these locations—no racially motivated factors entered into its consideration. Because the composition of the Grambling and Louisi-

---

**15.** As the District Court found, "placing a school in Ward II would surround it with a population that is over 90 percent black" and would "itself . . . violate . . . the consent decree." R. at 731. The Court further stated that

> [t]he only way to bring white children to Ward II would be by massive busing. When a simpler alternative, integrated neighbor-

hood schools, is available, such massive busing is unwarranted.

*Id. See United States v. Hendry County School District, supra* at 554 ("We must also insure that the burdens of desegregation are distributed equally * * * the overall transportation burden will be distributed with equal effect upon each race.")

**16.** *See* discussion, *infra.*

**982**

ana Tech schools clearly lay outside the scope of the consent decree, the School Board officials reasonably disregarded those schools in its selection of sites.

 We next turn to the question whether the District Court correctly denied the United States' motion to add defendant parties to litigation under the 1970 consent decree. The gravamen of the motion is that the laboratory schools were initially established as part of the dual system of public schools and that they continue to be segregated under at least indirect authority of the Lincoln Parish School Board. Because these schools operate in an allegedly unconstitutional manner, the United States asserts, the Court should allow the addition as defendants of the presidents of Grambling and Louisiana Tech, the members of the State Board of Elementary and Secondary Education, and the State Superintendent of Education.

In denying this motion, the District Court stated that

The reason for the additional parties is to litigate issues of discrimination and segregation in the laboratory schools at Grambling State University and Louisiana Tech University. These issues are not adjuncts to the issues of discrimination and desegregation in schools under the jurisdiction of the Lincoln Parish School Board. Actions No. 76–1197 and No. 12071 were concerned only with schools under the jurisdiction of the School Board. Thus, the interests of justice and clarity require that the United States seek its relief in a separate suit rather than in the pending ones.

We disagree with the District Court's determination that "justice and clarity require" denying the United States' motion. To the contrary, an independent determination that the laboratory schools should be desegregated will surely affect any ongoing litigation under the consent decree. It would be much more reasonable to allow the Government to proceed within the context of this ongoing litigation and thus avoid possible duplicative actions and orders. In the interest of judicial economy,

we thus reverse the District Court's order and allow the United States to add the stated parties as defendants. In doing so, we express no opinion regarding the merits of the Government's attempt to enforce desegregation of the laboratory schools.

AFFIRMED IN PART; REVERSED IN PART.