**Marilyn Marie MONTEILH, et al., Plaintiffs-Appellants,**

v.

**ST. LANDRY PARISH SCHOOL BOARD, et al., Defendants-Appellees.**

Nos. 87-4224, 87-4651.

United States Court of Appeals, Fifth Circuit.

July 1, 1988.

Marion Overton White, Opelousas, La., Norman J. Chachkin, Julius L. Chambers, Theodore M. Shaw, New York City, for plaintiffs-appellants.

I. Jackson Burson, Jr., Asst. Dist. Atty., Eunice, La., for defendants-appellees.

Before TIMBERS,[*] KING, and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

These two consolidated cases present challenges to desegregation efforts of the St. Landry Parish School Board. In one case, appellants attack the district court's dismissal of their action after finding that the school system previously had been declared unitary. In the other, appellants challenge the Board's adoption of a high school construction and consolidation plan. We reverse the dismissal because the district court erred in deciding that the school system already had been declared unitary. We affirm the district court's approval of the construction plan, finding that the Board fulfilled its constitutional obligations in choosing construction sites and setting attendance zones.

## I

Nearly twenty years ago, we found the St. Landry Parish school system's freedom-of-choice plans to be ineffective in fostering desegregation.[1] On August 9, 1969, the district court ordered implementation of a desegregation plan drafted by the Department of Health, Education, and Welfare. The district court later approved modifications of the plan. Plaintiffs appealed and the panel remanded with instructions for the district court to implement a student assignment plan complying with *Swann v. Charlotte–Mecklenburg Board of Education.*[2]

On remand the district court approved various modifications to zone lines and grade structure. The court also ordered semiannual reports by the School Board and required the Board "specifically [to] assign personnel in the positions of the principal, assistant principal, guidance counselor, and head coach in each school so that the race of these does not indicate that the school was intended for Negro students or for white students." At the end of the order the court declared the St. Landry Parish school system "to be unitary in its entirety." The court retained jurisdiction to preserve the unitary system.

A panel of this circuit affirmed the order on appeal, stating that the district court correctly retained jurisdiction and should continue to do so for at least three years. Moreover,

> [i]n no event should the district court dismiss this action without notice to the plaintiffs below and a hearing providing opportunity to plaintiffs to show that deliberate action by school authorities or some other agency of the State has affected the unitary status of this system

---

[*] Circuit Judge of the Second Circuit, sitting by designation.

1. *Hall v. St. Helena Parish School Board,* 417 F.2d 801, 809 (5th Cir.), *cert. denied,* 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180 (1969).

2. 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

so that further intervention of the district court is required.[3]

No further proceedings occurred until 1979 when the School Board closed Washington High School after racial fights erupted. A consent decree, which included a provision reassigning most of the staff, eventually was entered to govern the school's reopening.

## II

The history of this litigation demonstrates the progress the Parish has made in desegregating its schools. The district court's opinion of July 2, 1970, details the then tense situation. When the Supreme Court decided that freedom-of-choice no longer was sufficient,

> citizen groups favoring freedom of choice were organized, mass meetings were held, and public sentiment inflamed by opponents of desegregation from within and without the parish. The defendant Board was subjected to continuous public pressure, as a result of which it failed to propose any plan of operation on its own initiative, but instead declined to do so, maintaining that "freedom of choice" was the only acceptable method to accomplish the transition.[4]

Marshals and FBI agents were needed to prevent violence and ensure children's safety. Racial incidents on campus were frequent. Private white academies flourished and many public teachers resigned to accept positions at the academies. As the district court opinion also explained, after it became clear that freedom-of-choice was dead the Board began "acting in good faith with the best interests of all children in the school system, black and white, as its primary concern." [5]

That spirit of cooperation and progress has continued. In 1969, there was one black high school principal under the H.E.W. plan; there now are five. The Board's figures show that in 1969–70, there were fifteen black principals (34%) and twenty-nine white principals (66%); in 1986–87 there were nineteen black principals (43%) and twenty-five white principals (57%). Six schools with a majority white population have black principals, and five majority black schools have white principals. The school system had thirteen black head coaches (37%) and twenty-two white head coaches (63%) in 1969–70. In 1986–87, there were thirty-three black head coaches (58%) and twenty-four white head coaches (42%).

The political scene in St. Landry Parish also has changed. There now are three black school board members. Indeed, one of these members, Joshua Pitre, has served as the Board's Vice–President.

## III

### No. 87–4651

The St. Landry Parish School Board closed the South Street Elementary School in Opelousas at the end of the 1983–84 school year, reassigning the students to other Opelousas schools. However, on May 21, 1987, the Board decided to reopen the facility and, on June 23, 1987, Superintendent Henry DeMay requested approval from the district court to reopen the school.

Plaintiffs opposed the reopening, arguing that the Board had not considered the desegregation effects of the action and alleging that the reopening was "designed to perpetuate their quasi racially-dual system." The court scheduled a hearing to consider opposition to the reopening for August 31. On the same day it scheduled the hearing, the court declared that it "plan[ned] to dismiss this action based on the fact that the St. Landry Parish School System was found to be unitary on August 12, 1971."

After the hearing, the district court issued a ruling on September 1st, approving

---

**3.** *Monteilh v. St. Landry Parish School Board,* 451 F.2d 1348, 1349 (5th Cir.1972) (per curiam).

**4.** *Monteilh v. St. Landry Parish School Board,* No. Civ. 10912, slip op. at 2 (W.D.La. July 2, 1970).

**5.** *Id.* at 14.

the school's reopening as being necessary to alleviate overcrowding at Park Vista and Grolee Elementary Schools, where classes were being conducted in portable buildings. The court also found that the school system had been declared "unitary" in 1971 and dismissed the case with prejudice.

■ The district court erred in dismissing the suit based on the 1971 declaration that St. Landry Parish was a unitary school district, which we have defined as "a district in which schools are not identifiable by race and students and faculty are assigned in a manner that eliminates the vestiges of past segregation."[6] This circuit has established procedures that must be followed before a district court can declare a school system unitary. For at least three years, the school board must report to the district court. The court then must hold a hearing to consider whether the district should be considered unitary; plaintiffs must receive notice of the hearing and an opportunity to show why the system is not unitary and why continued judicial supervision is necessary. Only after these procedures are followed may a district court be sufficiently certain that a school system is unitary and dismiss the case.[7]

■ In declaring St. Landry unitary in 1971, the district court did not follow this circuit's procedures; indeed, in affirming the order, the panel directed the lower court to maintain jurisdiction over the case for at least three years, after which the case should be dismissed only after the plaintiffs had been afforded a hearing "to show that deliberate action by school authorities ... ha[d] affected the unitary status of [the] system." The panel would not have required compliance with these procedures had it believed the district court had found St. Landry to be unitary.[8] Indeed, if the lower court had done so, "the retention of jurisdiction would have been anomalous."[9] Thus, because our procedures had not been followed before the court in 1971 declared St. Landry to be unitary, we find that neither the district court nor the panel affirming its order intended to declare that the district was unitary, in the sense of having eliminated all vestiges of past discrimination. Consequently, we reverse the lower court's dismissal of this case.

IV

No. 87–4224

A

St. Landry operated twelve high schools[10] when a high school construction

6. *United States v. St. Lawrence County School District*, 799 F.2d 1031, 1034 (5th Cir.1986).

7. *See id.* at 1037–38; *Ross v. Houston Independent School District*, 699 F.2d 218, 227 (5th Cir. 1983); *Youngblood v. Board of Public Instruction*, 448 F.2d 770, 771 (5th Cir.1971) (per curiam); *see also United States v. Overton*, 834 F.2d 1171, 1175 n. 12 (5th Cir.1987) (describing the *Youngblood* procedures).

8. *See St. Lawrence*, 799 F.2d at 1038.

9. *Id.* at 1037; *see also Pitts v. Freeman*, 755 F.2d 1423, 1426 (11th Cir.1985) (stating that district court possibly did not intend that its use of "unitary" be equated with unitary status requiring dismissal because Fifth Circuit procedures had not been followed).

10. These schools were located in Arnaudville, Eunice, Grand Prairie, Lawtell, Leonville, Melville, Opelousas, Palmetto, Plaisance, Port Barre, Sunset, and Washington.

The School Board provides us with these 1986 enrollment figures for the high schools:

| SCHOOL | BLACK | WHITE | TOTAL |
|---|---|---|---|
| Arnaudville | 63 (11%) | 525 (89%) | 588 |
| Eunice | 224 (34%) | 430 (66%) | 654 |
| Lawtell | 148 (51%) | 145 (49%) | 293 |
| Leonville | 160 (41%) | 245 (59%) | 413 |
| Melville | 96 (42%) | 135 (58%) | 231 |
| Opelousas | 686 (73%) | 259 (27%) | 945 |
| Palmetto | 215 (86%) | 34 (14%) | 249 |
| Plaisance | 758 (95%) | 42 (5%) | 800 |
| Port Barre | 176 (21%) | 664 (79%) | 840 |
| Sunset | 198 (45%) | 244 (55%) | 442 |
| Washington | 342 (78%) | 97 (22%) | 439 |

and consolidation plan was presented to the school board on February 13, 1986. Dudley Auzenne and Hilman Boudreaux,[11] two supervisors of child welfare and attendance, had drawn up the plan, which then had gone to a supervisory committee. The plan consolidated the high schools into six and set tentative zone lines. On March 6, 1986, the Board adopted the proposed consolidation plan and called for a vote on a bond issue financing the construction of three high schools; the public approved the issue in early May.

The Board on June 5, 1986, approved a partial consolidation plan for the 1986–87 school year. This plan made Grand Prairie High School a K–8 school and transferred the high school students to Plaisance and Washington High Schools. The plan also closed Melville High School and transferred those students to Melville Middle School; Krotz Springs students would be transferred to Port Barre High School.[12]

The district court denied plaintiffs' request for an order restraining the plan's implementation on August 12, 1986. It recognized that the school district was under a duty to ensure that school abandonments and construction did not perpetuate or reestablish a dual system. The district court was convinced that the Board's reasons for implementing the partial consolidation plan were financial rather than racial. Moreover, while the Board did not consider the desegregative effects of the two high schools' early closure, it did do so "in the broader picture in light of the overall consolidation of schools planned for the parish...." The court explicitly stated that it was neither approving nor disapproving of the consolidation plan as a whole.

The school board's Building, Lands and Sites Committee on August 28, 1986, asked the Board to request the central office staff to set the attendance zones under the consolidation plan and to calculate the racial composition of each high school under the new zones. Superintendent DeMay delegated these tasks to a supervisory com-

mittee,[13] and provided four guidelines for the committee to follow:

1. Current attendance zones for all elementary or junior high schools should be kept as they presently are to avoid confusion on the part of the general public on where children will go to school.
2. New attendance zones are needed only for the three new consolidated high schools to be built.
3. New zone lines should enable students to attend school as near as possible to their residence to avoid longer bus routes.
4. The racial makeup of the new consolidated schools should reflect the racial makeup of those schools used as feeder schools for consolidation to insure that all new schools to be built will be integrated.

The plan also had five declared objectives:

1. High school zoning will provide for centrally located schools with a minimum of travel of students.
2. All high school students will be provided with the same comprehensive core curriculum with a maximum of elective course offerings.
3. No community will be divided.
4. There will be only minimal changes in any present zone line.
5. All high schools will be better integrated compared to what we now have.

The committee presented its proposed zones to the Board, which requested its Executive Committee to examine the zone lines more closely and also asked for the submission of alternate plans. The Board again received the proposed zone plan, with only a minor revision made by Superintendent DeMay, on November 20. Two of the Board's three black members, Gilbert Austin and Joshua Pitre, also presented a plan, which provided for five consolidated high

---

11. Auzenne is black and Boudreaux is white.

12. Fifth grade students at Melville Middle would be moved to Melville Elementary.

13. The committee was composed of three blacks and three whites.

schools, each containing grades 9–12.[14] After rejecting a motion made by Mr. Austin to hire a professional firm to conduct a demographic study before adopting final zones, the Board approved the plan as revised.

The plan as adopted consolidated the eleven high schools into six, with rearranged attendance zones. Eunice, Opelousas, and Port Barre High were not consolidated. The zone lines for Opelousas and Eunice were not changed, and the only change for Port Barre was the inclusion of high school students from Krotz Springs. The Southeast school incorporated Arnaudville, Leonville, and Sunset schools, as well as some students from the Lewisburg area, who formally had attended Lawtell High. The North school incorporated Palmetto, Morrow, Melville, and Washington, as well as some students attending school in adjacent Avoyelles Parish. The Northwest school incorporated Plaisance, Washington, Grand Prairie, Lawtell, excluding Lewisburg, and nineteen students attending school in Evangeline Parish.

On December 9, 1986, the district court filed a minute entry scheduling a hearing for December 29 in order to consider the attendance zones approved by the Board on November 20. The district court later explained that the hearing was prompted by a newspaper article that the Board was preparing to purchase sites to construct new schools under the consolidation plan. The court approved the zones on December 29,

recognizing that the system was nonunitary and that the Board had a duty to see that school construction and abandonment did not reestablish the dual system. The court also found that the high schools would be better integrated than they were currently.[15] On January 14, 1987, the court denied plaintiff's motion for a new trial or to alter or amend the judgment.

Appellants first argue that the Board failed to justify its construction and consolidation plan as an acceptable means of dismantling the Parish's dual school system. Second, they argue that the judgment must be set aside for procedural errors. Third, they request the Board be enjoined from further action. We are not persuaded that there is reversible error and we reject appellants' requested relief.

B

In examining the Board's actions, we keep three propositions in mind. First, school districts have "an affirmative duty, overriding all other considerations with respect to the locating of new schools, except where inconsistent with 'proper operation of the school system as a whole' to *seek* means to eradicate the vestiges of the dual system."[16] Indeed, the Supreme Court has stated that "it is the responsibility of local authorities ... to see to it that future school construction and abandonment are not used and do not serve to perpetuate or re-establish the dual system."[17] Second,

**14.** The Austin–Pitre plan provided for schools in the northeast, northwest, south, Opelousas, and Eunice. The northeast zone combined Palmetto, Melville, and Port Barre. The northwest zone combined Plaisance, Grand Prairie, and Washington, along with portions of Lawtell and Opelousas. The southern zone would combine Sunset, Arnaudville, and part of the Leonville zone. Opelousas High's zone would include part of its former zone and portions of the prior Leonville and Lawtell zones. Eunice High's zone would include all of its current zone and part of the old Lawtell zone. Opelousas and Eunice High would be renovated, while the other three schools would be newly constructed.

**15.** In the December 29, 1986, hearing approving the plan, the district court stated that "[t]he racial makeup of the new consolidated schools ... should reflect the racial makeup of those schools used as feeder schools for consolidation

to ensure that all new schools to be built will be integrated."

**16.** *United States v. Texas Education Agency,* 532 F.2d 380, 398 (5th Cir.1976) (quoting *United States v. Board of Public Instruction,* 395 F.2d 66, 69 (5th Cir.1968)) (emphasis in original), *cert. denied,* 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979); *see also Tasby v. Estes,* 517 F.2d 92, 105 (5th Cir.), *cert. denied,* 423 U.S. 939, 96 S.Ct. 299, 46 L.Ed.2d 271 (1975).

**17.** *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 21, 91 S.Ct. 1267, 1278, 28 L.Ed.2d 554 (1971); *see also United States v. Hendry County School District,* 504 F.2d 550, 554 (5th Cir.1974) ("[T]he School Board of such a [formerly dual] system must demonstrate that the new construction will not tend to promote such a relapse [into segregation].").

federal courts lack the expertise and competence needed to dictate to school boards the location of new schools and the drawing of attendance zones. "Location of a school comes within the purview of the federal courts only to the extent that it has an impact on desegregation." [18] Third, we review the district court's actions under a clearly erroneous standard.[19]

The Board has fulfilled its responsibility. First, although Auzenne and Boudreaux ought to have had desegregative effects in the forefront when they first set about to develop a plan, the supervisory committee did so, for one of the objectives set for the committee by Superintendent DeMay was that "[a]ll high schools will be better integrated compared to what we now have." [20] Moreover, the committee was composed of members of both races, and the report it submitted was unanimous.

Second, and significantly, as the district court found, the plan does result in more integration. Specifically, the court determined that the north and northwest zones would show significant integration. The north zone would drop to 67% Black from 86% Black in Palmetto and 78% in Washington. The northwest zone would drop to 66% Black in two years from the current 95% Black in Plaisance. The Southeast zone and Port Barre would not change

percentages substantially, and Eunice and Opelousas involved no changes.

■ The constitution does not require school districts to achieve maximum desegregation; that the plan does not result in the most desegregation possible does not mean that the plan is flawed constitutionally. "The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole." [21] "The school board's constitutional duty is to cure the continuing effects of the dual school system, not to achieve an ideal racial balance." [22]

### C

■ Appellants also attack the plan on more specific grounds. First, they argue that the projected enrollments are invalid; the enrollments fail to consider zone-jumping, a population shift from the north, and drop-out rates between lower grades in high school. The record, however, shows that the Board neither encourages nor approves of zone-jumping; [23] any improper zone-jumping may, in any event, later be brought to the attention of the district court. It was also argued that blacks were migrating out of the north faster than whites, suggesting that the ratio of blacks

**18.** *United States v. Perry County Board of Education,* 567 F.2d 277, 280 (5th Cir.1978); *see also Lee v. Autauga County Board of Education,* 514 F.2d 646, 648 (5th Cir.1975) (per curiam) (emphasizing that it was not telling the Board to select a new site for the proposed school or to implement extensive additional busing); *Tasby,* 517 F.2d at 106 ("We have not the competence to tell the DISD and the district court where new schools should be built, which facilities should re [sic] renovated, and which buildings should be abandoned.").

**19.** *See Copeland v. Lincoln Parish School Board,* 598 F.2d 977, 981 (5th Cir.1979); *see also Hendry County,* 504 F.2d at 553 (reviewing lower court's approval of construction site under abuse-of-discretion standard).

**20.** Superintendent DeMay testified that one of the objectives was that "all high schools would be more evenly integrated than they were in the past."

**21.** *Swann,* 402 U.S. at 24, 91 S.Ct. at 1280.

**22.** *Lee v. Tuscaloosa City School System,* 576 F.2d 39, 41 (5th Cir.1978); *see also Pitts,* 755 F.2d at 1427 ("We do not hold, however, that the defendants' affirmative duty compels them to adopt the most desegregative alternative available."); *cf. Acree v. County Board of Education,* 533 F.2d 131, 132 (5th Cir.1976) (per curiam) ("The effect of the [attendance zone] changes approved is not to alter significantly existing racial ratios in the schools in question, and these are, if not all that might be desired, tolerable at the present time.").

**23.** Mr. Auzenne testified in the hearing reviewing the partial consolidation plan that school administrators never intentionally allowed zone-jumping. Mr. Boudreaux testified that principals are instructed not to enroll anyone outside of their school zone. Principals also sign an affidavit each year stating that the students that are enrolled in their school are from their zone.

to whites would become more even.[24] As for the drop-out rate, the record is not clear regarding the number of children that quit school at the different grade levels. However, we have found nothing to overcome the deference due the school officials in their overall judgment regarding the plan's segregative effect.

Monteilh also argues that the Board's plan *increases* segregation and that the Board failed to consider its plan's desegregative effects. We reject both propositions. The district court found that the plan would increase integration, and that finding is not clearly erroneous. We also have found that the Board met its constitutional obligations in formulating the plan.[25]

■ Monteilh also argues that no acceptable justification was given by the Board for rejecting the Austin–Pitre plan. While the Board need only justify its own plan, which it has done, the Board *did* justify its rejection of the Austin–Pitre plan. Superintendent DeMay testified that the plan when submitted failed to provide much of the numerical data on the number of black children and white children who would attend the schools.[26] DeMay also objected to splitting Lawtell into three different schools, "causing a lot of confusion and heartbreak on parents and friends of kids who all like to go to the same high school."

Monteilh also argues that the Board's retention of Port Barre does not satisfy the Board's remedial obligations because the school will be racially identifiable as white. Monteilh cites our decisions in *United States v. Pittman*[27] and *Valley v. Rapides Parish School Board.*[28] Monteilh concludes the argument by suggesting that the Board instead should have adopted at least this portion of the Austin–Pitre plan, which allegedly would result in more integration.

■ Plaintiffs' reliance upon these cases is misplaced. They do hold that "[t]he retention of *all-black or virtually all-black* schools within a dual system is nonetheless unacceptable where reasonable alternatives may be implemented."[29] Apart from the fact that Port Barre would be disproportionately *white,* we have noted that "[i]t is axiomatic that the existence of a few racially homogenous schools within a school system is not per se offensive to the Constitution."[30] Finally, the school system in *Pittman* presented few barriers to desegregation. As we noted, "[t]he school district is small, compact, and logistically manageable from the standpoint of desegregating by the pairing and clustering of schools."[31] That is not the situation here. St. Landry is large geographically, not at all compact, and, as both plans demonstrate, requires the splitting of communities to implement a consolidation plan.

■ We also reject any suggestion that the North high school will receive an unequal educational opportunity because as a smaller school it would receive fewer funds. Monteilh, however, provides us with no evidence that facilities and course offerings will be inferior. Andrew Dartez's testimony directly refutes that argument, demonstrating that the same enrichment courses will be taught, although with fewer sections.

### D

■ Monteilh also alleges procedural errors, and divides this allegation into two parts. First, Monteilh attacks the court's

---

24. Mr. Austin suggested both that the situation in the North had stabilized and that there was migration "to a certain extent."

25. Mr. Austin did not dispute that the size of the Parish meant that there was no practical way of avoiding schools with the majority of one race or another. His dispute was with the *degree* of integration.

26. Mr. Austin admitted his plan lacked crucial data but alleged that the central staff did not provide him with the information.

27. 808 F.2d 385 (5th Cir.1987).

28. 702 F.2d 1221 (5th Cir.), *cert. denied,* 464 U.S. 914, 104 S.Ct. 276, 78 L.Ed.2d 256 (1983).

29. *Id.* at 1226 (emphasis added).

30. *Id.*

31. *Pittman,* 808 F.2d at 386.

management of the proceedings, believing that the court's *ex parte* communications with the Board were improper.[32] Monteilh in addition alleges that the court *ex parte* modified prior injunctive orders.

We are not persuaded. Plaintiffs have alleged no prejudice from the *ex parte* communications, other than to suggest in general terms that the record has been "sharply restricted" and that counsel had been unable fully to prepare for the hearing. This plea of ignorance of board action chooses to ignore, and we do not, the reality that Mr. Pitre, law partner of plaintiff's counsel, is a member of the Board and surely was aware of the Board's plans.[33] To the extent that Monteilh complains of *ex parte* communications not connected with the consolidation plan, such as review of the Bi-Racial Committee decisions, plaintiffs should have broached the subject with the district court when they first became aware of the communications. These other communications do not bear on this proceeding.

The same is true of any other alleged modifications of the original decree, such as zone changes of the Grolee and Lawtell Elementary Schools. These should have been challenged when plaintiffs first learned of them; nor are we told of their bearing on this proceeding.[34]

We also reject Monteilh's complaint that the Board should have filed "appropriate motion papers." Monteilh had a full hearing, for which appellants had sufficient time to prepare, to contest the plan. The filing of "appropriate motion papers" would deliver to plaintiffs only that which they already have had—a hearing in district court.

Monteilh also argues that the district court erred in denying counsel's request for a continuance of the December 29 hearing. We review the denial for abuse of discretion and here find no abuse. The district judge stated that he wished he could have continued the hearing, but that he had interrupted a jury trial for the hearing. It is not an abuse of discretion for a court to consider "the demands on counsel's time and the court's."[35]

E

Monteilh finally requests that school construction be enjoined pending preparation of a new consolidation plan. Because we have not found the Board to have erred in designing its own plan, we refuse the request.

AFFIRMED in part and REVERSED in part.

---

32. For example, Judge Shaw on December 7, 1986, requested from Superintendent DeMay documents about the consolidation plan.

33. We note that Mr. Pitre voted to approve the partial consolidation plan at an Executive Committee meeting and before the full Board.

34. We note that the district court immediately instructed the Board to file appropriate papers in the Opelousas case when the Monteilh plaintiffs requested the court to do so. The nature of school cases creates the risk of dropping many of the "usual formalities." These rules and customs are important, although the manner adopted below is understandable and is not a basis for reversal here. We are not by our opinions approving of them.

35. *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1193 (5th Cir.1986).