**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 99-60846


JOAN ANDERSON and JUDY LYNN ANDERSON, minors, by their mother and next friend, Mrs. Bessie Anderson; JUANITA BENNETT, MARY LEE BENNETT and ARCHIE LEE BENNETT, minors, by their father and next friend, Mr. James Bennett; ET AL.

                                        Plaintiffs-Appellants

and

UNITED STATES OF AMERICA

                                    Intervenor Plaintiff-Appellant

versus


THE CANTON MUNICIPAL SEPARATE SCHOOL DISTRICT; ET AL.

                                                    Defendants

SCHOOL BOARD OF MADISON COUNTY; ROBERT E. COX, Superintendent of Education; HAROLD E. DACUS, Assistant Superintendent of Education; M. L. DEWEES, JR., President; HAROLD H. WHITE, JR., Secretary; E. L. HENDERSON; M.C. MANSELL; E. W. HILL

                                            Defendants-Appellees


- - - - - - - - - -
Appeals from the United States District Court
for the Southern District of Mississippi
(CA-3700)
- - - - - - - - - -
November 6, 2000

Before KING, Chief Judge, CUDAHY,[*] and WIENER, Circuit Judges.

WIENER, Circuit Judge:

---

[*] Circuit Judge of the Seventh Circuit, sitting by designation.

Private Plaintiffs-Appellants and Intervenor Plaintiff-Appellant United States (collectively "Plaintiffs") appeal the district court's approval of the location proposed by Defendant-Appellee Madison County School District ("MCSD" or "the District") for a new high school in that district. Madison County was ordered to desegregate its de jure dual school system in 1969. It has since entered into a number of consent decrees, including one earlier this year. This most recent consent decree has been approved by all parties and by the district court and resolves all disputed issues between the parties — including, significantly, student transportation — save only that of the location of the new high school. Plaintiffs argue that the district court erred in approving the District's construction plan for the new high school, insisting that it would not meet the District's obligation, as a former de jure segregated district, to further desegregation. We conclude that the district court did not err in finding that the District's proposed site satisfies the obligations imposed by law, including all applicable consent decree provisions.

## I. *Facts and Proceedings*

The District is one of the many school districts in Mississippi that were ordered to dismantle their race-based de jure dual school systems.[1] Since then, the District has been the subject of a number of other desegregation orders and consent

---

[1] See Anderson v. Hinds County Sch. Bd., 423 F.2d 1264 (5th Cir. 1969).

decrees. Among other things, the District is required to make all decisions regarding the construction of school facilities in such a way as to further desegregation.

The District is U-shaped and surrounds the county seat of Canton, which is not a part of the District. The 1969 desegregation order divided the District into three Zones: Zone I is a rural, sparsely populated area located in the northeast part of the county; Zone II, in which 76% of the District's students reside, is in the southern part of the District and includes the cities of Ridgeland and Madison; and Zone III, like Zone I, is a rural, sparsely populated area but is located in the western part of the county and includes the town of Flora. Zone I has its own high school (Velma Jackson), and none of the parties have suggested that it be considered or included in plans regarding the new high school. Zones II and III are presently served by a single high school, Madison Central High School ("Madison Central").

The instant dispute is an outgrowth of the District's determined need to construct new schools, specifically a new high school, because of the tremendous population growth, largely white, over the last ten years. The District's enrollment was predominately black until the late 1980s, but since that time the student population has grown dramatically and become increasingly white as a result of the population boom in the vicinity of the predominately white communities of Madison and Ridgeland. This is evidenced by the fact that enrollment in these areas surged by 47%

3

between the 1991-92 and 1997-98 school years. This rapid growth led to the overcrowding of Madison Central: It had a projected capacity of 1,600 students, but its enrollment had reached 1,955 students by April 1, 2000. Population growth around the cities of Madison and Ridgeland is predicted to continue for the foreseeable future; in contrast, the rural areas of the District have experienced, and likely will continue to experience, little or no growth. Thus, the overcrowding problem at Madison Central will be exacerbated in the near future while Velma Jackson High School in Zone I will remain unaffected.

To remedy this situation and address a number of concomitant problems, the District proposed to construct several new schools and renovate other existing facilities, subject to the passage of a bond issue for those purposes. In May of 1998, following preclearance by the United States Attorney General, county voters approved, by the requisite 60% supermajority, a $55 million bond issue for the construction and renovation of school facilities. The bond issue was validated by the Chancery Court of Madison County in September of 1998. The bond proposal, as approved by the voters, included a number of details, specifying in relevant part that the new high school would be located in Ridgeland, a predominately white area ("Ridgeland site"). This new high school ("Ridgeland High" or "the new high school") would have an initial capacity of 700 students and a build-out capacity of 1200, and would be built on land to be purchased by the District. Like

4

Madison Central, the new high school would serve students from Zones II and III, and its initial enrollment would be taken from among those students currently attending the overcrowded Madison Central.

After passage and certification of the bond issue, the District filed a motion in district court to modify the existing desegregation plan, seeking approval to construct five new schools (one high school, two middle schools, and two elementary schools), renovate existing schools, and make related student reassignments. Plaintiffs opposed MCSD's plan, claiming that it violated the 1969 desegregation order, a number of consent judgments,[2] and federal law, because, inter alia, it failed to further desegregation and imposed travel burdens inequitably between black and white students. The parties subsequently entered into a consent decree (the "2000 consent decree") which the district court approved, that settled their disagreement on all points of difference except the location of the new high school. Among other things, the 2000 consent decree resolved the racially inequitable transportation burdens borne by the black students of the District and generally alleviated the excessive transportation burdens borne by other students, both black and white.

Plaintiffs continued to advocate an alternative, more centrally located site for the new high school, on a parcel of land

_____

[2] The District is subject to the requirements of four consent decrees, entered into in 1988, 1989, 1990, and now, 2000.

already owned by the district at the intersection of Highways 463 and 22 ("Hwy. 463 site"). Plaintiffs contend that locating the new high school on their preferred site would have reduced the travel burdens on a number of students and ensured that the new school would be less predominately white.

The district court, after a seven-day hearing, entered its Memorandum Opinion and Order granting the District's motion and approving the plan. It ruled that "the proposed [Ridgeland] site will not negatively affect desegregation in the district, now or in the future." Despite finding MCSD's "construction plan . . . in some respects short-sighted, inexplicable, and ill-advised" and recognizing that "[c]onstructing a high school half the size of the existing Madison Central which leaves little actual growing room at Madison Central does not seem particularly prudent," the district court reluctantly approved MCSD's construction plan "because it [did] not find ultimately that the District's construction/ renovation plan either negatively affects desegregation in the district, or that there exists at this time a reasonable prospect for further desegregation." Plaintiffs appealed and filed a motion to stay the order, which was granted by the district court.

6

II. *Analysis*

A.   Standard of Review

     We review the district court's decision approving MCSD's proposed location of the new high school for clear error.[3] We review the district court's findings of fact under that same standard.[4]   Under the clearly erroneous standard, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."[5] We review errors of law <u>de</u> <u>novo</u>.[6]

---

     [3] Our most recent case law on this subject of district courts approving the location of new schools in districts subject to desegregation orders dictates that we review for clear error. <u>See</u> <u>Monteilh v. St. Landry Parish Sch. Bd.</u>, 848 F.2d 625, 631 (5th Cir. 1988).  In supporting that proposition, that case cites to two cases.  One supports the proposition that we review for clear error. <u>See</u> <u>Copeland v. Lincoln Parish Sch. Bd.</u>, 598 F.2d 977, 981 (5th Cir. 1979).  The other, however, holds that we review for abuse of discretion.  <u>See</u> <u>United States v. Hendry County Sch. Dist.</u>, 504 F.2d 550, 553 (5th Cir. 1974). The inconsistency does not matter here, though, as we affirm the decision of the district court under the more stringent clearly erroneous standard.

     [4] <u>See</u> <u>Anderson v. City of Bessemer City</u>, 470 U.S. 564, 573–74 (1985).

     [5] <u>Id.</u>

     [6] <u>See</u> <u>Morris v. Homco International, Inc.</u>, 853 F.2d 337, 343 (5th Cir. 1998).

B.    Obligation of the District to Further Desegregation

The original desegregation order for Madison County, entered in 1969 pursuant to our decision in Hinds County,[7] required that (1) the county be divided into the three attendance zones described above, (2) transportation of students be performed on a "non-segregated and non-discriminatory" basis, and (3) "[a]ll school construction, school consolidation, and site selection (including the location of temporary classrooms) in this system shall be done in a manner which will prevent the recurrence of the dual school structure once this desegregation plan is implemented." In considering proposals for the construction or renovation of schools in a system still subject to a desegregation order, "[w]e cannot tolerate resegregation of a former dual school system, and the School Board of such a system must demonstrate that the new construction will not tend to promote such a relapse. We must also ensure that the burdens of desegregation are distributed equally among all classes of citizens."[8]

We must nevertheless remain at all times cognizant of the deference that must be accorded to school boards in their decisions such as the placement of schools; the "[l]ocation of a school comes within the purview of the federal courts only to the extent that it

---

[7] 423 F.2d 1264 (5th Cir. 1969).

[8] United States v. Hendry County Sch. Dist., 504 F.2d 550, 554 (5th Cir. 1974) (citing Keyes v. School Dist. No. 1, 413 U.S. 189, 93 S.Ct. 2686 (1973); United States v. Board of Public Instruction, 395 F.2d 66 (5th Cir. 1968)).

has an impact on desegregation."[9]  This is because we "lack the expertise and competence needed to dictate to school boards the location of new schools and the drawing of attendance zones."[10]  It is not our place to decide whether the school board's proposed site for the new high school is the best choice or even a wise choice; we must decide only whether the choice of that site violates the Constitution or federal law.  To make that determination, federal courts ask only whether the proposed location fails to further desegregation or places an inequitable transportation burden on black students.  So long as neither answer is in the affirmative, we must defer to the expertise of school boards in decisions of this nature.

1.  Racially Inequitable Transportation Burden

Until recently, the transportation burden was clearly distributed inequitably between the white and black students in the District.  A number of students, most of whom were black, endured onerous bus rides every school day.  In fact, some students who reside in the predominately black Flora area traveled as long as 2½ hours *each way* on a daily basis.  After the filing of this appeal, however, the parties entered into the 2000 consent decree which resolves the transportation issue and thus renders moot the second ground for Plaintiffs' objection to the planned site for the new

---

[9] Monteilh, 848 F.2d at 632 (quoting United States v. Perry County Board of Education, 567 F.2d 277, 280 (5th Cir. 1978)).

[10] Id.

high school. That decree specifies that "the District shall insure that transportation to school is provided on a non-discriminatory basis and that no regular bus route will exceed one-and-one half hours each way for any student." As for the students in the predominately black Flora area, the 2000 consent decree specifies that "the District shall use its best efforts and shall add additional bus routes as appropriate to ensure that no high school student in the Flora attendance zone will ride more than 45 minutes one way." In the event that this should not prove possible for all Flora students, "[t]he District shall provide in its reports to the Court an explanation for the additional time of the bus ride" regarding those students whose travel time exceeds 45 minutes. As enforcement of these provisions is expected to resolve all concerns regarding inequitable transportation burdens that may otherwise result from construction of the new high school at the site selected by the District, this issue has been removed from our purview in the instant appeal. Should the provisions of the consent decree be violated or fail to resolve existing or future transportation burdens, or should the transportation burdens borne by students become racially inequitable, redress must be fashioned by the district court or by this Court on subsequent appeal — but not prospectively and speculatively in this appeal.

2. The Proposed New High School Furthers Desegregation

The sole remaining issue then is whether the district court clearly erred in approving the District's proposed site for the new

10

high school on finding that it furthers desegregation. Plaintiffs insist that constructing the new high school in the predominately white Ridgeland area will not further desegregation in the short term and will lead to resegregation in the future. As of April 10, 2000, the District's student population was 61.4% white, 36.7% black, and 1.9% other, of which overall high school student enrollment — including largely black Velma Jackson High School in Zone I — was 60.1% white, 38.1% black, and 1.7% other. The enrollment of Madison Central — from which the students of Ridgeland High will be drawn exclusively — was 71.8% white, 26.1% black, and 2.1% other.

The District asserts that the initial enrollment at new Ridgeland High will be 71.4% white, 24.3% black, and 4.3% other; and that after transfer of those Madison Central students who would attend Ridgeland High, Madison Central's student population would be 72.2% white, 26.7% black, and 1.1% other. Plaintiffs nevertheless oppose building the new school at the Ridgeland site, arguing that the interests of desegregation would be better served by a more centrally located high school, specifically their suggested Hwy. 463 site. Plaintiffs' proposal calls for the construction of a high school that would initially serve approximately 900 students, of whom 67% would be white and 33%

black, leaving Madison Central with roughly 1,300 students, of whom 78% would be white and 22% black.[11]

The District is not required, however, to select school sites that best or even better serve desegregation; only sites that serve desegregation and do not foster resegregation. "The constitution does not require school districts to achieve maximum desegregation; that the plan does not result in the most desegregation possible does not mean that the plan is flawed constitutionally."[12] Admittedly, the District's plan may not maximize desegregation or even be the plan among all those available that is best suited for that purpose. With this in mind, we cannot say that the district court committed clear error in finding that locating the new high school in the Ridgeland area would assist in the District's continuing effort to desegregate its schools, much less negatively affect desegregation.

Plaintiffs also argue that constructing the new high school at the Ridgeland location will negatively affect desegregation in the future in light of population trends in the County. Specifically, they allege that the City of Ridgeland and the surrounding area will become "more white," while the predominately black Flora area — which, they contend, will grow substantially — becomes "more

___

[11] These numbers are based on the projected student populations by Plaintiffs. We note that this plan would <u>increase</u> the percentages of white students at Madison Central by over 6% and <u>decrease</u> the number of black students by over 4%.

[12] <u>Monteilh</u>, 848 F.2d at 632.

black." As such, insist the Plaintiffs, the student population of Madison Central would become "more black" while that of Ridgeland High would become "more white." The District contests these population projections, asserting that the Flora area will see little growth, either long or short range, as evidenced by the fact that its student population has decreased by some 10% in the last decade. Rather, contends the District, growth will continue to occur in and around the cities of Madison and Ridgeland, both of which are located to the east of I-55; as such, the new high school can best serve the District's needs if located at the site proposed by the District.

We recognize yet again that courts are poorly equipped to weigh such population trend projections; fortunately, though, we are not required to do that today. As the claims of both parties appear to be reasonable and rest on legitimate bases, we cannot say that the district court committed clear error in adopting the District's projections over the Plaintiffs' or in finding that construction of the new high school at the Ridgeland site would serve to foster the District's continuing efforts to desegregate the schools of Madison County without negatively affecting desegregation in the future.

## III. *Conclusion*

Decisions about construction, renovation, and administration of school facilities are the province of the local school boards as long as such decisions do not violate the Constitution or federal

13

law.  The Madison County School District is free to construct its schools at locations of its choice and in such a manner as it sees fit — even at a site or in a manner that we might consider unwise or downright foolish — as long as, in the process, it does not retard desegregation or affect its students in a racially inequitable manner.  Based on our review of the record on appeal, we discern no clear error in the district court's finding that locating the new high school at the Ridgeland site does not violate these requirements.  Therefore, the judgment of that court is, in all respects,

AFFIRMED.

S:\OPINIONS\PUB\99\99-60846.CR0
4/28/04  5:46 pm