REVISED JANUARY 8, 2009

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 17, 2008

Charles R. Fulbruge III
Clerk

No. 08-60061

SPECIALTY RENTAL TOOLS & SUPPLY, LP

Plaintiff-Appellant

v.

WILLIAM P SHOEMAKER, SR

Defendant-Appellee

Appeal from the United States District Court
for the Southern District of Mississippi

Before WIENER, GARZA, and DeMOSS, Circuit Judges.

WIENER, Circuit Judge:

Plaintiff-Appellant Specialty Rental Tools & Supply, LP ("STS") sued its former employee, Defendant-Appellee William P. Shoemaker, Sr., to enforce a covenant not to compete. STS appeals the district court's grant of Shoemaker's summary judgment motion that dismissed STS's action with prejudice. We affirm.

## I. FACTS

For a period of almost ten years preceding March 1, 2002, Shoemaker owned and operated Southeastern Rentals, LLC ("Southeastern"), an oilfield

related service company. In March, 2001, a representative of STS, also an oilfield related business, approached Shoemaker to discuss the possible purchase of Southeastern by STS. These discussions culminated early in January, 2002, with the submission to Shoemaker of a "Letter of Intent," proposing that STS purchase Southeastern and employ Shoemaker. In response, Shoemaker had his attorney review the Letter of Intent and reply to STS. The terms of the non-competition covenant became an issue: Later that month, Shoemaker's lawyer wrote to STS about the Letter of Intent, informing STS of, inter alia, Shoemaker's disagreement with the proposed non-competition agreement. STS promptly responded with an alternate version of a non-competition clause, which version never made it into the final contracts.

The parties eventually agreed on the terms and conditions of the sale of Southeastern to STS and the employment of Shoemaker by STS, including a non-competition arrangement. The details of the purchase of Southeastern and the employment of Shoemaker by STS were memorialized in three agreements that the parties executed contemporaneously on March 6, 2002, effective March 1, 2002 (sometimes referred to as the Date of Closing and sometimes as the Effective Date), to wit: the (1) Members Interest Purchase Agreement ("Purchase Agreement"), (2) Non-Competition Agreement, and (3) Employment Agreement. The latter two agreements were first shown to Shoemaker and his lawyer at the closing on March 6, 2002.

Pertinent provisions of Purchase Agreement state:

9.7 Covenant Not to Compete. During the period commencing on the Date of Closing and continuing until either the second anniversary of the Date of Closing or on the second anniversary of the termination of [Shoemaker's] employment by [STS], whichever occurs later, (the "Non-competition Period"), [Shoemaker] shall not (and shall cause each Non-competition Party (as defined below) not to), directly or indirectly own, manage, operate or control or be employed by any business in competition with the business activities conducted by [STS] on the Date of Closing or

2

the date [Shoemaker] is no longer an employee of [STS]....

10.4 Entire Agreement. This Agreement (including the documents referred to herein) and the Non-Compete [sic] Agreement constitute the entire agreement between [STS] and its Affiliates, on the one hand, and [Shoemaker] and his Affiliates, on the other hand. This Agreement supersedes any prior understandings, agreements, or representations by or between [STS] and its Affiliates, on the one hand, and [Shoemaker] and his Affiliates, on the other hand, whether written or oral, with respect to the subject matter hereof (other than the Confidentiality Agreement).[1]

Pertinent provisions of the Non-Competition Agreement state:

WHEREAS, the parties hereto intend this Non-Competition Agreement to supersede any other non-compete agreements previously entered into by the parties, whether such agreements are written or orally made;...

NOW, THEREFORE....

The term of this Agreement shall be the period commencing [March 1, 2002] and ending two (2) years after March 1, 2002, the Effective Date of the [Purchase Agreement] (the "Term")....

This Agreement constitutes the entire agreement between [STS] and Shoemaker with respect to the subject matter hereof, except as provided in Section 5 [regarding validity and judicial severance], no amendment or modification shall be valid unless made by supplemental written agreement, executed by the parties hereto or their successors or permitted assigns....[2]

Pertinent provisions of the Employment Agreement state:

3. TERM. [Shoemaker's] Employment under this Agreement shall be for five (5) years, beginning on March 1, 2002 and ending on March 1, 2007....

---

[1] Emphasis added.

[2] Emphasis added.

> 16. TERMINATION. This Agreement may be terminated by either party upon 14 days written notice. If [STS] shall so terminate this Agreement, [Shoemaker] shall be entitled to compensation for the remainder of the contract term, unless [Shoemaker] is in violation of this Agreement or is terminated "for cause...."[3]

By virtue of the interrelated transactions embodied in these three contemporaneously executed contracts, STS purchased Southeastern from Shoemaker, and Shoemaker went to work for STS, on the terms and conditions set forth in those contracts.

Fast forward five years. On or about February 28, 2007, Shoemaker received, by hand-delivery, a letter dated February 21, 2007, signed by STS Vice President Edward Petru. The letter stated in pertinent part:

> This letter is to advise you that your employment contract with [STS] will expire March 1, 2007, and will not be renewed. This notice does not constitute a termination of your contract, rather a notice of non-renewal.[4]

Petru's February 21, 2007 letter directed Shoemaker's attention to only two sections of the Employment Agreement: Section 19, entitled "Return of Property" and Section 9, entitled "Confidentiality." The letter made no reference whatsoever to the Purchase Agreement or the Non-Competition Agreement.

Within days after receiving Petru's letter (and after the Employment Agreement expired on its own terms), Shoemaker went to work for a direct competitor of STS. This triggered the mailing of a cease-and-desist letter from STS to Shoemaker, threatening legal action and referring to the non-competition clause in the Purchase Agreement, but making no reference whatsoever to the

---

[3] Emphasis added. According to deposition testimony of STS Vice President of Finance and Administration Edward Petru, these three closing documents were prepared for STS by an attorney in Houston, Texas, who served as counsel to STS in its transaction with Shoemaker and Southeastern.

[4] Emphasis added.

Non-Competition Agreement or the Employment Agreement.

When Shoemaker failed to respond to its cease-and-desist letter, STS filed the instant lawsuit. In its complaint, STS sought (1) injunctive relief prohibiting Shoemaker from competing against STS, (2) damages sustained as a result of Shoemaker's interfering with the business or contractual relations of STS, (3) punitive damages, and (4) all expenses of the litigation. (While this case was pending in the district court, STS withdrew its claims for monetary damages.)

## II. DISTRICT COURT PROCEEDINGS

In considering Shoemaker's motion for summary judgment, the district court established the framework for its analysis by noting that this diversity case turns on the substantive law in Mississippi, specifically, that State's law applicable to interpreting contracts by determining the intent of the parties.[5] In more narrowly framing its task, the district court quoted the Mississippi Supreme Court's pronouncement that "restrictive covenants are in restraint of trade and individual freedom and are not favorites of the law."[6] It emphasized that the enforceability of such agreements is "largely predicated upon the reasonableness and specificity of its terms."[7]

Turning to the pertinent provisions of the contracts entered into simultaneously by the parties, the court focused on the contentions of STS that (1) the non-competition clauses of the agreements are ambiguous or at least in conflict, and (2) the Covenant Not to Compete in section 9.7 of the Purchase Agreement is "dominant." The district court examined the wording of the non-competition clauses in pari materia and concluded that the intent of the parties was

---

[5] Holland v. Mayfield, 826 So. 2d 664, 669 (Miss. 1999).

[6] Frierson v. Sheppard Bldg. Supply Co., 154 So. 2d 151, 172 (Miss. 1963).

[7] Empiregas, Inc. of Kosciusko v. Bain, 599 So. 2d 971, 975 (Miss. 1992).

for Shoemaker to work for [STS] for a period of five years and that if he quits [sic] or was terminated during that five-year period, he would be subject to the non-compete clause for two years thereafter. However, the court finds that the parties clearly intended that once Shoemaker concluded his five-year term of employment, he would no longer be prohibited from competing with [STS].

In reaching this determination, the district court focused on the meaning of "terminate," "termination," and "terminated," as used in the agreements and concluded that they were:

defined in the employment documents to include termination for cause but also allow[] for termination by either party for any reason upon fourteen days written notice. There is no dispute that Shoemaker was not terminated for cause nor was he terminated under the fourteen day notice provision.

The court reinforced its determination that, in using variations of the word "terminate" in the agreements, the parties contemplated that Shoemaker's employment at STS would be deemed to have been "terminated" only if it ended (1) prior to the completion of five years (2) as the result of an act taken by one of the parties to the agreements. In underscoring its conclusion that the parties' intention was for the word "terminate" to cover only a pre-expiration cessation of Shoemaker's employment as the result of an affirmative act of either STS or Shoemaker, the court observed that STS:

was very careful in its wording of the "termination" letter of February 21, 2007, by stating that Shoemaker was not being terminated, only that his contract was not being renewed. Thus, it is clear that [STS] understood and appreciated the differentiation, meaning, and effect of the term 'termination' versus a non-renewal under the contract.

The court reasoned that the parties did not intend for their non-competition covenants to survive beyond the five-year period of Shoemaker's employment if it ran the full course without either party having taken an affirmative act to end

his employment earlier. Based on this analysis, the district court held that neither non-competition provision applied to the instant situation, in which Shoemaker's employment by STS simply expired on his completion of its specified five-year term. The court granted Shoemaker's motion for summary judgment and dismissed STS's action with prejudice. STS timely filed a notice of appeal.

## III. ANALYSIS

### A. Standard of Review

We review de novo the district court's grant of a summary judgment dismissing the plaintiff's lawsuit with prejudice.[8] We may affirm the judgment of the district court for any valid reason.[9]

### B. Merits

We agree with the district court that (1) the instant diversity case is controlled by the substantive law of Mississippi, (2) the laws of that state disfavor restrictions on competition, (3) this case turns on interpretation of the contracts entered into by the parties and thus requires a determination of their intent, and (4) the intent of the parties as to the provisions prohibiting Shoemaker's competition after he no longer worked for STS turns on the meaning of "termination" as used in the controlling documents. We also agree with the district court's ultimate conclusion that the parties intended to limit the meaning of "termination" to cessations of Shoemaker's employment resulting from an affirmative act of one of the parties by or before the end of its specified term, and not to include the expiration of Shoemaker's employment at the end of its five-year term.

---

[8] Burden v. Johnson & Johnson Med., 530 F.3d 389, 393 (5th Cir. 2008) (citing Jenkins v. Cleco Power, LLC, 487 F.3d 309, 313 (5th Cir. 2007).

[9] McGruder v. Will, 204 F.3d 220, 222 (5th Cir. 2000).

In reaching its ultimate conclusion, the district court determined that (1) the language of the agreements is somehow ambiguous regarding non-competition, (2) any ambiguity must be construed against STS as the drafter of the agreements, and (3) the enforceability of the non-competition provision of one of the agreements in priority over such a provision in another of the agreements turns on a determination of which covenant is "dominant." When we construe the instruments as a whole, as we must, we are satisfied that there is no ambiguity as a matter of law. As we shall explain, we are convinced that the non-competition covenant of only one of the agreements is applicable under these facts. That being the case, we need not address the district court's answers to the questions (1) should one or more of the agreements be construed against STS as the "drafter," (2) which non-competition provision is "dominant," (3) does the signing of all three agreements on March 6, 2002 constitute contemporaneous execution and thus mandate interpretation in pari materia or, to the contrary, does the sequence of their signing on that day make any of them "prior" or "previous" to the other, and (4) may evidence outside the four corners of each of the three agreements be considered if there is no ambiguity in the controlling provisions of those documents.

As both the Purchase Agreement and the Non-Competition Agreement contain covenants against competition, we must determine preliminarily whether either or both of those covenants remained in effect and enforceable when Shoemaker's employment by STS ended on February 28, 2007. Although both covenants expressly commenced when Shoemaker's employment began on March 1, 2002, they specified terms of at least potentially different durations. The covenant set forth in the Non-Competition Agreement specifies a fixed expiration, viz., "two (2) years after March 1, 2002...('The Term')," so once Shoemaker's employment continued without interruption beyond that two-year period, that covenant evanesced into irrelevancy. In contrast, the duration of the

Purchase Agreement's "Covenant Not to Compete" was not fixed in the same sense; rather, it continued in lockstep with the continuation of Shoemaker's employment, enduring until "the second anniversary of the termination of [Shoemaker's] employment." Potentially, then, the Purchase Agreement's covenant could have remained enforceable for a maximum of two years after the stated five-year term of Shoemaker's employment, i.e., as late as February 28, 2009 — but only if his employment were to continue for essentially all of the maximum five-year duration specified in those agreements and be terminated contemporaneously with its specified date of expiration. Clearly then, the Purchase Agreement's Covenant Not to Compete was the only non-competition provision even potentially enforceable by STS when Shoemaker and STS parted company on February 28, 2007; the Non-Competition Agreement had expired on its own terms a full three years earlier.[10] Therefore, as after March 1, 2004, there no longer remained two covenants in potential conflict (if they ever were), we need address only the wording of the one such covenant still in effect, viz., the Purchase Agreement's Covenant Not to Compete. For the same reason, we need not address any possible ambiguity or conflict between the two covenants or whether one of the two covenants is or was ever dominant. (STS presumably recognized all this because, in seeking to prevent Shoemaker from competing

---

[10] If we were to read the above-quoted merger clause of the Non-Competition Agreement ("the parties hereto intend this Non-Competition Agreement to supersede any other non-compete agreements previously entered into by the parties...") as trumping the non-competition clause of the Purchase Agreement so that the only non-competition restriction affecting Shoemaker was that in the Non-Competition Agreement, STS would have no basis for its claims because of that agreement's automatic expiration on March 1, 2004. But, as we explain infra in footnote 12, we do not view any of the merger clauses of the agreements as applicable to the other agreements executed contemporaneously on March 6, 2002, because none was executed "previously" or "prior to" the others signed that day. The covenant in the Purchase Agreement was not supplanted by the merger clause of the Non-Competition Agreement, so the latter did not have the effect of leaving STS with no covenant against competition in existence after the March 1, 2004 expiration of the Non-Competition Agreement.

with it after his employment ended, STS invoked only the Purchase Agreement's non-competition provision — and not that of the Non-Competition Agreement — as grounds for its enforcement action.)

By defining the duration of the "Non-competition Period" as the longer of (1) two years after March 1, 2002 or (2) two years after the "termination of [Shoemaker's] employment by [STS]," section 9.7 of the Purchase Agreement pinpoints "termination" as the operable word. As it is undisputed that Shoemaker remained in the employ of STS for the full five-year term specified in the agreements, the determinative question presented here is whether the expiration of Shoemaker's employment at the end of those five years was a "termination" for purposes of the Purchase Agreement's Covenant Not to Compete. If section 9.7 could be enforced at all after Shoemaker's five-year employment contract expired, it would only be because, as STS argues, the agreements employ "terminate," "termination," and "terminated" expansively, incorporating both the transitive and intransitive forms of the verb, "to terminate." Under such a broad application, "terminate" would include the cessation of Shoemaker's employment not only by an act taken by one of the parties, such as Shoemaker resigning or STS firing him, but also by the mere passage of time. An examination of the agreements, particularly the interplay between the durations and cessations of their non-competition covenants and the terms and conditions of Shoemaker's employment, persuades us that such an expansive interpretation was not what STS and Shoemaker intended when they executed the documents.

Any doubt that the parties' intent was to limit the meaning of "terminate" to its transitive form, i.e., to an affirmative act of a party to halt Shoemaker's employment, is firmly laid to rest by the relevant provisions of the third of the March 6, 2002 contracts, the Employment Agreement. First, that contract refers

10

to Shoemaker's five-year period of employment as "ending" — not as "terminating" — on March 1, 2007. This dovetails with that agreement's section 16, "TERMINATION," which states that "[t]his [Employment] Agreement may be terminated by either party upon 14 days written notice."[11] Here, the use of terminate is ineluctably limited to affirmative acts of the contracting parties. This is further confirmed by the Employment Agreement's contemplation of the (1) possibility that STS "shall so terminate this Agreement" — obviously using the transitive form of "to terminate" and thus requiring an affirmative act — and (2) the further possibility that Shoemaker could be "terminated" 'for cause...,'" indisputably contemplating the affirmative act of STS firing him before his employment expires on its own terms.

To further highlight the distinct roles of the various contracts, we note that each of the parties wore two hats when they executed the Purchase Agreement, but that each wore only one hat when they executed the other two agreements. In signing the Purchase Agreement, STS wore both its business-buyer's hat and its employer's hat, and Shoemaker wore both his business-seller's hat and his employee's hat. In signing the Employment Agreement and the Non-Competition Agreement, however, STS wore only its employer's hat, and Shoemaker wore only his employee's hat. This distinction is made clear by the above-quoted sections of the Purchase Agreement: Section 9.7 binds not only Shoemaker but also each of his "Non-competition" parties or his "Affiliates"; and it does not simply prohibit Shoemaker and those parties from accepting employment "by any business in competition with the business activities conducted by" STS, but also bars Shoemaker and each Non-competition Party or Affiliate from "directly or indirectly" owning, managing, operating, or controlling any such competitor of STS. Moreover, section 10.4 broadly defines

---

[11] Emphasis added.

"Breach of the Purchase Agreement" as applying not just to STS and Shoemaker, but also to their respective "Affiliates." In contrast, the Employment Agreement and the Non-Competition Agreement bind only Shoemaker as an employee and STS as his employer. These distinctions underscore some of the differences in emphasis between the two non-competition provisions of those disparate agreements, although in the end they are of no particular significance.[12]

As STS lost its entitlement to enforce the Non-Competition Agreement's covenant when it expired on March 1, 2004, with Shoemaker still employed there, STS was left with the Purchase Agreement's Covenant Not to Compete as its only potential enforcement mechanism. But, after the March 1, 2004 anniversary of the signing of the Purchase Agreement, its covenant could be enforced only if a "termination of [Shoemaker's] employment by [STS]" occurred during the years of its five-year term. And, as this condition precedent never occurred, the Purchase Agreement's covenant against competition expired, simultaneously with the expiration of the Employment Agreement, on March 1, 2007. Again, no one disputes that Shoemaker's employment by STS continued without interruption until March 1, 2007: Neither party had ever furnished written notice to the other purporting to end Shoemaker's employment, with or without cause. Moreover, even if we were to accede to STS's argument and agree that the Purchase Agreement was the dominant agreement — so that the Non-Competition Agreement did not supplant the Purchase Agreement and its expiration did not bar STS from enforcing the Purchase Agreement's Covenant Not to Compete — the absence of any overt act of "termination of [Shoemaker's]

---

[12] The same can be said of the so-called merger provisions of the several agreements. These provisions refer to "prior understandings, agreements, or representations" or "other non-compete agreements previously entered into by parties," but none purports to preempt or negate either of the other agreements entered into contemporaneously on March 6, 2002. Consequently, no non-competition covenant of any of these contracts is rendered nugatory by a merger clause.

employment by the action of either party" before it expired would render the Purchase Agreement's non-competition clause wholly inoperable.

Finally, even if, arguendo, we were to accept the urgings of STS (and the assumption of the district court) that the use of "termination" or "terminate" in the subject agreements was somehow ambiguous, the propriety of restricting its meaning to the affirmative act of a party is confirmed beyond cavil by application of the well-known canon of contractual interpretation that the intent of the parties can be gleaned from the way that they perform their contract.[13] When Mr. Petru, representing STS in his capacity as Vice President of Finance and Administration, wrote to Shoemaker near the end (but still during the term) of Shoemaker's five-year employment by STS and stated unequivocally and unambiguously that "[y]our Employment Contract with [STS] will expire [not "terminate"] on March 1, 2007," even adding for emphasis that "[t]his notice does not constitute a termination of your contract, rather a notice of non-renewal," STS removed any possible doubt that the intention of the parties in using variations of "terminate" in their agreements did not extend to the passive expiration of Shoemaker's employment on its own terms.

## IV. CONCLUSION

Shoemaker's employment with STS ended on March 1, 2007 with the expiration of its express five-year term. It follows that Shoemaker's job with STS was never terminated within the meaning of the three contemporaneously executed agreements: The intent of the parties was for that term to include only the pre-expiration halting of his employment by an affirmative act of one of the parties. Not only does that meaning of terminate become obvious and

---

[13] See, e.g., Aladdin Constr. Co., Inc. v. John Hancock Life Ins. Co., 914 So. 2d 169, 176 (Miss. 2005); see also Roberts v. Roberts, 866 So. 2d 474, 481 (Miss. Ct. App. 2003) (a party may not assert a fact advantageous to it if its previous conduct is inconsistent with the fact asserted).

unambiguous when the agreements are read in pari materia, but STS so interpreted it by its performance of the contract, i.e., by furnishing its February 21, 2007 written notice to Shoemaker, expressly eschewing termination. Accordingly, the summary judgment rendered by the district court, dismissing STS's action with prejudice, is

AFFIRMED.