**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 6, 2009

Charles R. Fulbruge III
Clerk

No. 08-60309

GORDON REIGSTAD; KAREN REIGSTAD

Plaintiffs - Appellees

v.

DAVID PILGER; Individually and as President of Delta Title and
Escrow Company; DELTA TITLE AND ESCROW COMPANY

Defendants - Appellants

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 1:06-CV-859

Before KING, STEWART, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

Appellants David Pilger and Delta Title and Escrow Company (collectively "Pilger") appeal from a judgment in favor of Gordon and Karen Reigstad ("Reigstads") arising out of claims for legal malpractice and negligent misrepresentation. The Reigstads alleged that they retained Pilger to handle all aspects of the closing of the purchase of real estate in Ocean Springs, Mississippi, and Pilger negligently failed to secure property insurance coverage on the property, causing the Reigstads to have no insurance to cover the damage

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

to their property from Hurricane Katrina. Pilger also represented to the Reigstads at the closing that the property was insured, when in fact it was not. This diversity case was tried without a jury, and the court[1] entered findings of fact and conclusions of law. For the reasons discussed herein, we affirm.

## I.    Background

Delta Title and Escrow Company was owned by David Pilger, a lawyer. The Reigstads retained Pilger to represent them on the closing of a property in Ocean Springs, Mississippi. By letter dated August 15, 2005, Pilger wrote to the Reigstads: "Please call us with the name of your Homeowner's Insurance Agent. We must have proof of coverage prior to closing. We will collect and pay any necessary premiums at closing." Gordon Reigstad contacted his carrier, USAA, who informed Mr. Reigstad that it did not provide windstorm coverage. USAA referred Mr. Reigstad to The Insurance Barn. Mr. Reigstad contacted The Insurance Barn and spoke with its agent, Kim Rushing. Although Ms. Rushing could not specifically recall what she told Mr. Reigstad, the trial court made a factual finding that Ms. Rushing informed Mr. Reigstad during the call "that his premiums would be collected at closing."

Ms. Rushing later faxed an instruction sheet directly to Pilger. The instruction sheet stated that "[n]o coverage for windstorm can be put into effect until the signed application and check for the premium is received in our office." At trial, Pilger acknowledged receipt of the instruction sheet and admitted that he did not inform the Reigstads or their real estate agent of the instructions.

The closing took place on August 24, 2005. The Registads; Nancy Dorroh, the Reigstads' realtor; David Pilger; and Charlotte Farisse, the seller's agent,

---

[1] The parties consented to a trial before the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 78. The direct appeal to this court is proper pursuant to 28 U.S.C. § 636(c)(3).

2

attended the closing. The Reigstads were to deliver to Pilger the purchase price for the property[2] and a sum representing one year's hazard insurance premium set by The Insurance Barn. Pilger specifically assured the Reigstads that insurance coverage was in place on the home at the closing. Pilger did not dispute that he made the statement to the Reigstads, but he testified that he could not remember specific statements. The Reigstads testified that they would not have gone forward with the closing unless insurance coverage was in place.

On the afternoon of August 24, 2005, Hurricane Katrina was in the news. Pilger knew that a storm was pending, but he could not recall any details at the time of the trial. On August 25, 2005, the day after the closing, Pilger sent the Reigstads' unsigned application for coverage and check to The Insurance Barn, which received the documents on August 26, 2005. Upon receipt of the package, The Insurance Barn called Pilger, informed him that the application was unsigned, called Mr. Reigstad, and faxed Mr. Reigstad an application which he signed and returned the same day. By the time The Insurance Barn received the signed policy, it could not bind coverage because Hurricane Katrina had entered the Gulf of Mexico earlier that day.

Hurricane Katrina struck the Mississippi Gulf Coast on August 29, 2005. The Reigstads' new house was severely damaged by Hurricane Katrina. At the trial, Mr. Reigstad, a civil structural engineer, testified that the house was built on stilts. The base elevation was about fifteen (15) feet, and the water level inside the first level of the house was about four (4) feet. Therefore, approximately nineteen (19) feet of water was in the Reigstads' yard. The parties stipulated that the Reigstads sustained damages in the amount of $327,000.00. Mr. Reigstad testified that, based on what he saw when he went

---

[2] Reigstad paid $327,000 for the house, and it was a cash sale.

3

to the house and how the windows blew out, he estimated that 95% of the damage "was done long before the water got there."

In their application of windstorm and hail coverage, the Reigstads sought coverage for the house in the amount of $220,000 and coverage for contents in the amount of $25,000. There was a 2% deductible for the coverage.[3] The trial court rejected the Reigstads' request for the value of the home, stating that "Plaintiffs should not be awarded the value of the home because if insurance had been procured, Plaintiffs would only be entitled to a maximum of $220,000, the policy limits."

The Reigstads had two written estimates for damages: one estimate for $363,473.08 was based on repairs made to the house, but the estimate does not specify whether wind or water caused the damage; another estimate for $117,391 was based on damages caused specifically by wind damage. In making the damages calculation, the trial court stated as follows:

> The Court finds that the Baird estimate (P-14) is the best evidence of wind and/or wind driven rain damage to the home. Baird's estimate of $117,391.37 should be enhanced by the replacement of the HVAC of $5176 (P-15) to $122,567.37. However, it is clear when the Court compares the estimate (P-14) and the actual receipts (P-15) which Plaintiffs expended, that this estimate (P-14) was not wholly realistic.

The court then stated that the "wind and wind driven water damage to the home prior to any flood damage" was $163,500, half of the stipulated amount of damages of $327,000. The court awarded this amount minus the deductible that would have been due under the policy, $4,400, resulting in an award in the Reigstads' favor in the amount of $159,100.

---

[3] The application does not specify the percentage of the deductible. Neither Pilger nor the Reigstads dispute the amount of the deductible.

The court added the following:

> The Court notes that there was no expert testimony presented with regard to the wind versus flood issue. Further, the Court does not have before it the terms of an insurance policy which would have been in place if insurance had been procured. Finally there is very little explicit documentation with regard to the correlations between Baird's wind damage estimate found in (P-14) and the actual receipts of the Plaintiffs' (P-15) for repair of the entire dwelling. The Court has attempted to correlate these damages to the best of its ability.

Pilger appealed.

## II.    Discussion

Pilger does not contest negligence on appeal. Pilger argues, however, that in order to recover damages from Pilger, the Reigstads had to prove that had Pilger not been negligent, they would have had insurance coverage for the specific damages to their property. To do that, Pilger contends that the Reigstads had to produce some evidence of the terms and conditions of the insurance policy that would have been issued to them had Pilger not been negligent. Pilger argues that the only evidence presented at trial of the coverage was the application for insurance, and it was insufficient to carry their burden of proof. Alternatively, Pilger contends that the award amount is excessive because the only reliable estimate of wind damage was $117,391.37, and after subtracting the deductible, the judgment should be reduced to $112,991.37.

The Reigstads argue that they were seeking the full amount of damages to the house because had they known the accurate status of the insurance coverage on the day of closing, they would have rescheduled the closing and suffered no loss in Hurricane Katrina, as they would not have been the owners of the house. Even though the trial court did not award the Reigstads the full amount of damages, they argue that sufficient evidence supports the damages

5

award. The Reigstads emphasize that their claims were based on tort theories, not contract law, and Pilger's reliance on insurance contract construction cases is misplaced.

## A. Standard of Review

Mississippi substantive law applies in this diversity suit. *See Specialty Rental Tools & Supply, LP v. Shoemaker*, 553 F.3d 415, 419 (5th Cir. 2008). We review finding of fact for clear error and conclusions of law *de novo. City of New Orleans v. Mun. Admin. Servs., Inc.*, 376 F.3d 501, 506 (5th Cir. 2004); FED. R. CIV. P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."). Under the clear error standard, "if the [trial] court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson ex rel. Anderson v. Canton Mun. Separate Sch. Dist.*, 232 F.3d 450, 453 (5th Cir. 2000) (citation omitted). Even where there are different views of the evidence, "the factfinder's choice between them cannot be clearly erroneous." *Id.* (citation omitted).

## B. Analysis

To recover for legal malpractice under Mississippi law, "a plaintiff must prove by a preponderance of the evidence the existence of a lawyer-client relationship, negligence on the part of the lawyer in handling his client's affairs entrusted to him, and some injury proximately caused by the lawyer's negligence." *Baker Donelson Bearman & Caldwell, P.C. v. Muirhead*, 920 So. 2d 440 (Miss. 2006). The Mississippi cases discussing legal malpractice require that the plaintiffs "show that but for their attorney's negligence, they would have been successful in the prosecution or defense of the underlying action." *Pierce*

*v. Cook*, 992 So. 2d 612, 612 (Miss. 2008) (citations omitted). Based on the facts of this case, the trial court made a legal conclusion that "Pilger committed legal malpractice."

To establish a claim for negligent misrepresentation, a plaintiff must show (1) a misrepresentation or omission of fact, (2) that the representation is material or significant, (3) failure to exercise reasonable care on the part of the defendant, (4) reasonable reliance on the misrepresentation, and (5) damages as a direct result of the reasonable reliance. *Powell v. Cohen Realty, Inc.*, 803 So. 2d 1186, 1186 (Miss. Ct. App. 1999) (citing *Levens v. Campell*, 733 So. 2d 753 (Miss. 1999)). The trial court also made a legal conclusion that "Plaintiffs have established liability for negligent misrepresentation." On appeal, Pilger takes issue with liability based on the sufficiency of the evidence and the amount of damages.

1. Sufficiency of the Evidence

The trial court recognized that the Reigstads had not produced any policy as evidence. The court, therefore, relied on the stated terms of the Mississippi Windstorm Underwriting Association ("MWUA") application to find that the value of the policy would have been $220,000. Based on the "standard deduction in most policies," the court also found that the policy amount would have had a 2% deductible, applied against the policy value. We find no clear error in these findings.

Pilger argues that the Reigstads had to produce evidence of the specific terms and conditions of the policy or policies which they sought. The Mississippi cases upon which Pilger relies are inapposite. *See Pope v. Schroeder*, 512 So. 2d 905 (Miss. 1987) (discussing legal malpractice where lawyer failed to timely file an appeal); *Hickcox v. Holleman*, 502 So. 2d 626 (Miss. 1987) (discussing legal malpractice claim for failure to file suit within limitations period). In *Williams*

*v. Henson*, 42 F. Supp. 2d 628, 632 n.6 (N.D. Miss. 1999), the district court cited a Mississippi case for the proposition that "the measure of damages recoverable against an agent has been held to be the amount for which the insurer would have been liable had proper insurance been effected." *Id.* at 632 n.6 (quoting *Simpson v. M-P Enterprises, Inc.*, 252 So. 2d 202, 207 (Miss. 1971)). Neither *Williams* nor *Simpson* supports Pilger's argument that the "specific terms and conditions of the policy" must be presented into evidence.

Pilger relies heavily on *Atlas Roofing Mfg. Co., Inc. v. Robinson & Julienne, Inc.*, 279 So. 2d 625 (Miss. 1973). Pilger argues that "[t]he Mississippi Supreme Court made it clear in the *Atlas Roofing* decision that in order to recover damages, the prospective insured has to produce more proof than to merely state, as the Reigstads have done, that they wanted 'hurricane insurance' or had applied for a policy through the 'wind pool.'" In *Atlas Roofing*, the plaintiff, Atlas Roofing, alleged that their agent, Robinson & Julienne, had negligently failed to provide adequate fire insurance on its facility, and as a consequence, plaintiff had been unable to collect the full amount of a fire loss sustained. *Id.* at 626. Robinson & Julienne argued that Atlas Roofing could have recovered the entire amount of their loss from the policy that was issued, but Atlas Roofing accepted less and failed to recover that loss solely because it neglected to pursue its claim in court. *Id.* at 628. Atlas Roofing countered by arguing that it would not have been able to recover under the policy that was issued. *Id.* The court indicated the difficulty of determining that issue in the absence of the insurer who issued the policy obtained by Atlas Roofing, because "there [was] no way of knowing what its position would be nor what defenses it would interpose." *Id.* The court, therefore, declined to determine if the absent insurer was, in fact, liable for the full amount of sustained damages. *See id.*

8

The court then noted that five years had lapsed since the issuance of the policy with no objection. *See id.* at 629. The court therefore concluded that "upon the whole record that Atlas failed to meet the burden which rested upon it to establish by evidence that it[s] loss was the result of negligence upon the part of [Robinson & Julienne]." *Id.*

In this case, there was no existing policy on the Reigstads' property, so there is no argument that an existing policy provided the requisite coverage. Here, it is undisputed that there was no windstorm coverage. Further, Pilger specifically told the Reigstads at the closing that insurance coverage was in place, although there was no coverage. The court's holding in *Atlas Roofing* does not support Pilger's argument. At trial, the Reigstads had to establish their claims by a preponderance of the evidence, and the MWUA application and testimony at trial are sufficient to support a finding on the amount of coverage that would have been in place but for Pilger's negligence. The trial court's assessment of the evidence is not clearly erroneous.

2. Amount of Damages

The trial court determined that the value of damages was $159,100. Pilger argues that the maximum amount of damages that could have been awarded to the Reigstads was $112,991.37, the amount of the wind damage estimate, $117,391.37, minus the $4,400 deductible. In making the damages determination, the trial court considered the Reigstads' exhibit substantiating the Reigstads' actual expenditures for repairs. Because this list of expenditures did not indicate whether damages were caused by wind or flood, the court also considered the estimate for only wind damage. Mr. Reigstad also testified that, based on what he saw when he went to the house and how the windows blew out, he estimated that 95% of the damage "was done long before the water got there."

9

The court considered Baird's estimate of wind damage to be the best estimate of wind or wind-driven rain damage, but the court did not totally disregard the other relevant evidence. The court undertook "an attempted correlation" between the Baird estimate of wind damage and the itemized list of total damages and concluded that the independent wind and wind-driven water damage to the home prior to the flood damage was $163,500. The court deducted the $4,400 deductible to reach the final award of $159,100. Although the court's calculation was not to a mathematical certainty, we do not find that the trial court's calculation of wind damage is clearly erroneous. The evidence of actual expenses incurred and Mr. Reigstad's testimony that 95% of the damages were caused by wind or wind-driven rain sufficiently supports the trial court's determination of damages in excess of the wind damage estimate. *See Green v. Seariver Maritime, Inc.*, 248 F. App'x 517, 519 (5th Cir. 2007) (unpublished) ("Trial testimony from both the plaintiff and his Captain substantiated the court's finding that the line used in that particular mooring was heavier and larger than previous mooring lines."); *Snow-Sorapuru v. Greyhound Lines, Inc.*, 54 F. App'x 405, 405 (5th Cir. 2002) (unpublished) ("The only evidence presented on the issue of causation was the testimony of the plaintiff. . . . Because the district court's findings were not clearly erroneous, we affirm.").

## III. Conclusion

For the foregoing reasons, we AFFIRM the district court's judgment.